IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MARK MITTELSTADT,

                           Plaintiff,

     v.

TOM VILSACK, in his capacity as SECRETARY,
UNITED STATES DEPARTMENT OF
AGRICULTURE,

                         Defendant.

OPINION AND ORDER

15-cv-725-wmc

---

Plaintiff Mark Mittelstadt brings this action under the judicial review provision of the Administrative Procedure Act, ("APA"), 5 U.S.C. § 702, challenging a final decision of Tom Vilsack, then Secretary of the U.S. Department of Agriculture ("USDA"), which upheld the denial of re-enrollment of his land in a conservation program administered by the USDA's Farm Services Agency ("FSA").[1]  Before the court is plaintiff's motion for summary judgment, seeking an order directing re-enrollment and awarding monetary relief for "breach" of an alleged, binding contract.  (Dkt. #18.)  For the reasons explained below, the court will not only deny summary judgment to plaintiff, but will affirm the Secretary's rulings.  As for his remaining contract claim, plaintiff will be given an

---

[1] The USDA denied reconsideration of a decision adverse to plaintiff on November 12, 2009. (Dkt. #16-6.)  This constitutes a final determination for purposes of this court's jurisdiction.  7 U.S.C. § 6999; *see Five Points Road Joint Venture v. Johanns*, 542 F.3d 1121, 1123 n.1 (7th Cir. 2008) (28 U.S.C. § 1331 provides subject matter jurisdiction for district court to address APA claim); *see also Califano v. Sanders*, 430 U.S. 99, 105 (1977) (same).  In addition, this court has ancillary jurisdiction of the APA claims to the extent it has jurisdiction over plaintiff's contract claim.  The court addresses the jurisdictional challenge defendant raises with respect to plaintiff's common law breach of contract claims in the opinion section below.  Finally, Sonny Perdue was sworn in as the USDA's 31st Secretary in April of 2017, but since the case will now be closed, the court has declined to amend the caption.

opportunity at trial to respond to the court's conclusion that judgment should be entered against him on the undisputed material facts pursuant to Fed. R. Civ. P. 56(f).

UNDISPUTED FACTS[2]

**A. Enrollment in Conservation Resource Program**

The Conservation Resource Program ("CRP") is a land conservation program administered by the FSA allowing farmers to enter into ten- to fifteen-year contracts to "remove environmentally sensitive land from agricultural production and [to] plant species that will improve environmental health and quality." (Pl.'s Opening Br. (dkt. #15) at 4.) In exchange, farmers receive a yearly payment. Plaintiff Mark Mittelstadt owns land in Richland County, Wisconsin, which had been enrolled in the CRP continuously from 1987 through 2006.

**B. 1998 Re-enrollment -- Contract 653**

Before 1998, Mittelstadt managed the land consistent with a 1990 "'Managed Forest Law Management Plan' that identified mandatory practices that [he] had to complete, as well as a hand-drawn site map that showed the location of and types of trees that [he] had planted." (Decl. of Frank Jablonski, Ex. 5 [hereinafter "Deputy Director Decision"] (dkt. #16-5) at 2.) In March 1997, Mittelstadt submitted an offer to re-

---

[2] The following is taken from factual findings in administrative decisions plaintiff challenges (dkt. ##16-4, 16-5, 16-6) and the administrative record ("AR") (dkt. ##19, 19-1, 19-2), with additional context added from the parties' submissions where helpful for understanding. Because of the narrow remaining issue left after the final USDA ruling, which was largely favorable to Mittelstadt -- as to his claimed right to keep his land in the land conservation program after 2017 -- most of these facts are for background and context.

enroll all 62.9 acres of his land in the CRP, indicating "that the acreage had a conservation practice of CP11, or 'vegetative cover - trees – already established.'" (*Id.*)

Based on the information in Mittelstadt's 1997 application, the FSA gave his land an Environmental Benefits Index ("EBI") score of 50, which corresponded to a designation of "Pine established with less than 500 trees per acre with strips of native herbaceous and shrub plantings best suited for wildlife in the area, *mixed hardwoods established*, or longleaf pine." (*Id.* at 2-3 (emphasis added).) The FSA approved re-enrollment of Mittelstadt's CRP land in Contract 653, which was effective between 1998 and 2007.

### C. 2007 Re-enrollment -- Contract 1710

In February 2006, the FSA notified Mittelstadt about the opportunity to re-enroll Tract 9073 in the CRP for another 10 years. (*Id.* at 3.) Tract 9073 was eligible for re-enrollment in the CRP because it was still enrolled during the final year of Contract 653. 7 C.F.R. § 1410.6(a)(3).[3] The process for re-enrollment is set forth in the FSA's "Handbook for the Agricultural Resource Conservation Program" ("Handbook"). (Decl. of Frank Jablonski, Ex. 1 [hereinafter "Handbook"] (dkt. #16-1).) According to the Handbook, after the applicant submits an "offer" to participate in the CRP, the county FSA office must first complete an eligibility review, and then the state office must review the offer's "detail and summary reports." (Pl.'s Opening Br. (dkt. #15) at 9.) After

---

[3] This subsection provides that among lands "eligible to be placed in the CRP" are: "Acreage enrolled in CRP during the final year of the CRP contract, provided the scheduled expiration date of the current CRP contract is before the effective date [of] the new CRP contract, as determined by the CCC[.]" 7 C.F.R. § 1410.6(a)(3).

those steps are completed, the Conservation and Environmental Programs Division ("CEPD"), a division of the FSA, reviews and ranks the offers for CRP re-enrollment.

In response to the FSA's notification, Mittelstadt indicated to the Richland County FSA office that he would like to re-enroll. To begin the re-enrollment process, Mittelstadt paid for a "spot-check" inspection of Tract 9073 in March 2006. A representative of the Richland County FSA office inspected Tract 9073 in May 2006. The inspection revealed no violations, finding "62.9 CP11 Tre[es] already est" and "good." (AR 168-69.) Those findings were consistent with an earlier "Status Review" conducted by a "district conservationist," who noted, "Trees are growing [and] looking good. No violations." (AR 179.)

Following the May 2006 inspection, CEPD determined that Tract 9073 was acceptable for re-enrollment. Mittelstadt was then sent "Contract 1710," a form CRP contract from the USDA's Commodity Credit Corporation ("CCC"), which identified Tract 9073 with a CP11 conservation practice. Mittelstadt signed that contract on July 26, 2006, but it was never countersigned by the CCC. Instead, Mittlestadt signed a revised version of Contract 1710 on August 19, 2006, which was amended to reflect accurately the acreage of Tract 9073. Although Jared Reuter, the County Executive Director of the Richland County FSA, did sign this amended version of Contract 1710 on behalf of the CCC on or around September 13, 2006, his signature was later "whited-out," apparently by someone at CCC. As a result, Mittelstadt never received a

countersigned copy of that agreement either.[4] (Def.'s Opp'n Br. (dkt. #20) at 7-8; AR 160.)

Along with the amended Contract 1710, another agency of the USDA, the Natural Resources Conservation Service ("NRCS"), sent Mittelstadt a conservation plan for Tract 9073 in August 2006. That plan identified the conservation practice as CP11, a "mixed stand (2 species) of hardwoods best suited for wildlife in the area.'" (Deputy Director Decision (dkt. #16-5) at 3.) The cover letter attached to the plan stated, "There are no management practices required. You are responsible for removing trees or brush from the CRP land if it was not planted as part of the original[] planting." (AR 153.) Mittelstadt signed the plan on August 24, 2006, and the Richland County Land Conservation Department approved it on September 1, 2006. The two involved USDA agencies signed off on the plan shortly after that: NRCS on September 5, 2006, and FSA on September 13, 2006.

### D. Cancellation of Contract 653

As FSA's County Executive Director, Reuter conducted two so-called "maintenance inspections" of Tract 9073 on the 14th and 16th of September 2006.[5] (Deputy Director Decision (dkt. #16-5) at 3.) A letter to Mittelstadt dated September 21, 2006, followed, advising that "it was observed on the 2005 aerial photo that three

---

[4] Defendant presumes that Reuter's signature was likely whited-out after he inspected Mittelstadt's property days after signing it, which is discussed further below. (Def.'s Opp'n Br. (dkt. #20) at 6.)

[5] Although its materiality is questionable, plaintiff contends that there is no provision in the Handbook for such "re-inspections" during this late stage of the re-enrollment process.

areas of your CRP appeared to have suffered tree loss that the field reporter did not originally report during the re-enrollment compliance check." (AR 99.) After listing findings from the inspection, the letter further warned:

> Violations of this type can result in termination of the acreage involved which will require refunds of all annual payments, cost-sharing, interest from the date of disbursement and assessment of liquidated damages. If the County Committee (COC) determines good faith in relation to the violation, a payment reduction will be assessed on the acreage involved and by a date by which the acreage must be back in compliance will be established.

(*Id.* at 99-100.) The September 21 letter also noted that the COC would discuss the issues raised by the inspections at their next meeting, then closed with a final warning to Mittelstadt that his "re-enrollment/extension offer cannot be approved until this issue is settled." (*Id.* at 100.)

The COC discussed the findings of the inspection at a hearing on October 25, 2006. The following day, the COC sent Mittelstadt a letter terminating Contract 653. In support of the termination, the COC explained, in relevant part:

> The remaining acreage left on the contract has a failed population of red oak which has been determined through documentation received from the appellant and statements made during the appeal hearing. Due to the failed red oak the score of 50 points under the N1a scoring factor for a mixed hardwood stand of trees (more than one species of hardwood trees) *was erroneous at the time of sign-up in 1997*.

(*Id.* at 74 (emphasis added).) The letter further explained that that "re-enrollment of this land is no longer eligible for the offered ten year contract as the land is no longer considered CRP due to the termination based on the erroneous enrollment." (*Id.*)

**D. Appeals**

Mittelstadt appealed the COC's determination to the Wisconsin State FSA Committee, which upheld the decision by letter dated August 13, 2007. In reaching its decision, the State Committee determined that "[t]here are no areas of the contract that qualify as 'mixed hardwoods.'" (*Id.* at 35.) In support of that finding, the State Committee referenced the 1990 Managed Forest Law Management Plan and attached map, concluding, "This document clearly shows there was not a mixed stand of hardwoods planted. It shows single species of hardwoods in the two largest areas (pines used as trainer trees) were planted and that the smallest area was planted solely with white pines."[6] (Deputy Director Decision (dkt. #16-5) at 4 (citing AR 25).) Consistent with the COC's determination, the State Committee also concluded that: (1) "the scoring of the contract in 1997 was incorrect"; and (2) "[t]he acreage is also ineligible for re-enrollment through the re-enrollment and extension process that was conducted in 2006 because the current contract was not in compliance." (AR 35.)

Mittelstadt next appealed to the USDA's National Appeals Division ("NAD"). At a prehearing conference, the "parties stipulated that the sole issue on appeal was the

---

[6] Defendant admits in the amended answer that the State Committee "relied on the notion that the term 'mixed hardwoods' meant two species of hardwoods planted together in the same rows." ((Dkt. #9) ¶ 70.) For additional context regarding the dispute over interpretation of the mixed hardwoods requirement, the State Committee's decision indicates that Mittelstadt admitted at the appeal hearing that "there were never areas of [his] acreage planted to more than one species of hardwood" and believed that "'mixed hardwoods' means only 1 hardwood species 'mixed' with pine," which was an interpretation that "other FSA offices" apparently shared with him as well. (AR 33-34.) The decision then notes that a "conservation specialist" present at the hearing disagreed, stating that "[a]lternating pine rows were authorized to be planted as trainer trees, but are not considered when scoring the stand as a hardwood stand for EBI purposes." (*Id.* at 34.) To the extent relevant, the court takes judicial notice that pine is generally considered a softwood, not a hardwood. *See* https://en.wikipedia.o rg/wiki/Pine.

erroneous eligibility determination that was made in 1997." (Deputy Director Decision (dkt. #16-5) at 4.) At the appeal hearing itself, the FSA representative further acknowledged that the FSA's "interpretation" of "mixed hardwoods established" with respect to the CP11 conservation practice differed from Mittelstadt's, and he also conceded that the FSA had never developed a written definition for that term. (*Id.* at 4-5.) In a written decision, the NAD hearing officer upheld the State Committee's determination, finding again that Contract 653 received an incorrect EBI score in 1997 because Tract 9073 did not satisfy the mixed hardwood trees requirement. (Decl. of Frank Jablonski Ex. 4 (dkt. #16-4) at 6.)

Mittelstadt then sought "Director Review" of the hearing officer's decision, which resulted in a written decision dated October 14, 2009. In that decision, NAD Deputy Director M. Terry Johnson reversed the hearing officer's decision as to the FSA's termination of Mittelstadt's existing Contract 653 running from 1997 to 2007. Since Mittelstadt had relied on repeated assurances that Tract 9073 satisfied the agency's unwritten interpretation of the mixed hardwood requirement "for at least nine, if not twenty, years," and the FSA had never published a contrary definition, Deputy Director Johnson held the retroactive application of a definition created in 2006 or 2007 was outside the FSA's authority. Accordingly, he found by:

> the preponderance of the evidence shows that the placement of trees on Appellant's land satisfied the "mixed hardwoods established" requirement for a CP 11 practice and warranted the assigned EBI score of fifty points. Thus, FSA must reinstate CRP contract number 653.

(Deputy Director Decision (dkt. #16-5) at 7.)

In contrast, Deputy Director Johnson declined "to find that FSA erred with respect to re-enrollment" of Tract 9073 under Contract 1710. Although Johnson found that Appellant Mittelstadt "did meet minimal eligibility standards until at least through the end [of] contract 653," he went on to hold that:

> FSA may change standards for eligibility and apply those standards prospectively. In that case, for the purposes of re-enrollment, FSA may evaluate whether Appellant meets the standards that existed at the time of the attempted re-enrollment. Appellant may not meet new standards such as a new definition of mixed hardwood stand or FSA otherwise may have a legitimate reason for not extending re-enrollment to Appellant. FSA notified Appellant of the new standard prior to the start date of contract 1710, *i.e.* prior to October 2007. In short, I conclude that FSA's denial of re-enrollment under contract 1710 was supported by applicable regulations and substantial evidence in the record.

(*Id.*)

NAD Director Roger Klurfeld denied Mittelstadt's request for reconsideration of Deputy Director Johnson's decision under 7 C.F.R. § 11.11, finding no "material error of fact or law." (Decl. of Frank Jablonski Ex. 6 (dkt. #16-6) at 1.) Director Klurfeld explained briefly the basis for his denial:

> I agree that your property was eligible for re-enrollment as currently enrolled property. However, although the property was eligible for re-enrollment in the CRP, agency regulations at 7 CFR § 1410.31(a) provide that acceptance or rejection of any offer of land by an owner for CRP participation shall be in the sole discretion of the CCC and offers may be rejected for any reason as determined to accomplish the goals of the program.

(*Id.*) Director Klurfeld further explained that while Deputy Director Johnson did not specifically cite 7 C.F.R. § 1410.31(a) in his decision, his affirmance of the FSA's denial

of re-enrollment was obviously based on the discretion afforded to the agency under that regulation. (*Id.*) By way of a further explanation for upholding FSA's decision, Director Klurfeld wrote, "[o]nce FSA concluded that the property no longer had as high an EBI score as it once did, FSA could use that score to decide that funding a continuation of enrollment of the property was not as high a priority as funding other CRP contracts." (*Id.*)

OPINION

In reviewing a final decision of the USDA, this court must determine whether the agency's actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Stable Invs. P'ship v. Vilsack*, 775 F.3d 910, 915 (7th Cir. 2015) (quoting 5 U.S.C. § 706(2)(A)); *see also St. Clair v. Sec'y of Navy*, 155 F.3d 848, 851 (7th Cir. 1998) (court must "examine the administrative record to determine whether the [agency] made an arbitrary or capricious decision, abused its discretion, acted contrary to law or regulation, or lacked the support of substantial evidence" (citing *Chappell v. Wallace*, 462 U.S. 296, 303 (1983))).

In this case, the parties' briefing is both all over the map and yet (strangely) manages to seldom, if ever, intersect. Nevertheless, plaintiff Mittelstadt makes two basic, related arguments with respect to his challenge to the USDA's final decision: (1) the agency abused its discretion by determining that denial of re-enrollment of Contract 1710 was appropriate because the parties stipulated as part of plaintiff's appeal to the NAD that the sole issue before the Deputy Director was whether an erroneous eligibility

determination had been made in 1997; and (2) the agency does not have the discretion to deny plaintiff 2007 re-enrollment based on a conservation plan standard it adopted in 2006. In addition, plaintiff appears to be claiming for the first time that Contract 1710 became enforceable by the actions of the USDA's Commodity Credit Corporation as a matter of federal common law, and since payments have not been made to him under that contract, defendant is now in breach. As a remedy, plaintiff seeks declaratory, equitable and mandamus relief "restoring" Contract 1710 and awarding him the missed payments.

In response to summary judgment, defendant USDA questions this court's jurisdiction to even consider a common law breach of contract claim outside the APA context, and it further argues that this court should affirm the Secretary's final decision under the APA. The court will take up the jurisdictional issue first and then move on to the merits.

## I.    **Jurisdiction Over "Breach of Contract" Claim**

To the extent plaintiff's amended complaint is intended to allege a common law claim for breach of Contract 1710, "separate from his APA claim" that the USDA abused its discretion in denying him re-enrollment under that contract, defendant argues that "this [c]ourt lacks jurisdiction, and jurisdiction rests exclusively with the Court of Federal Claims" for claims in excess of $10,000. (Def.'s Opp'n Br. (dkt. #20) at 3, 20-21 (citing Tucker Act, 28 U.S.C. § 1491(a)(1); *Brown v. United States*, 389 F.3d 1296, 1297 (D.C. Cir. 2004)).) Despite such a bold pronouncement, defendant fails to develop this

jurisdictional argument further, apparently viewing the proposition as either manifestly obvious or simply seeking to discharge an obligation to note this issue for the court. Regardless, defendant likely meant to cite 28 U.S.C. § 1346(a)(2), which limits a district court to jurisdiction over civil actions over the United States, including express or implied contracts, to those "not exceeding $10,000." In contrast, § 1491(a)(1) merely extends jurisdiction to the Federal Court of Claims over similar claims without any restriction as to the amount in controversy.

Plaintiff offers a similar, cursory analysis in his reply brief, block quoting several cases while making little effort to apply the legal principles discussed in those cases to his claims here. (*See* Pl.'s Reply Br. (dkt. #23) 25-28.) Regardless, the court must obviously take up the question of its subject matter jurisdiction. To begin, the Seventh Circuit Court of Appeals advises that 5 U.S.C. § 702

> was added to the Administrative Procedure Act in 1976 [and] waives sovereign immunity for a suit "seeking relief other than money damages and stating a claim that an agency . . . acted or failed to act" in conformity with law. Such a claim may proceed in a district court; only a request for "money damages" falls under the Tucker Act and is allocated to the Court of Federal Claims. But what does "money damages" mean? *Bowen* [*v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988),] holds that a suit can seek money without seeking "money damages." Massachusetts asserted that it had received less than its entitlement under the Medicaid program. The Supreme Court concluded that "damages" for the purpose of § 702 and the Tucker Act are a "substitute for a suffered loss, whereas specific remedies [even if financial] 'are not substitute remedies at all, but attempts to give the plaintiff the very thing to which he was entitled.'" 487 U.S. at 895, 108 S.Ct. 2722 (quoting from *Maryland Department of Human Resources v. Department of Health and Human Services*, 763 F.2d 1441 (D.C. Cir. 1985)).

*Columbus Reg'l Hosp. v. Fed. Emergency Mgmt. Agency*, 708 F.3d 893, 896 (7th Cir. 2013) (first and third bracketed alterations added). The Seventh Circuit went on to hold that even a civil suit seeking money from the United States in excess of $10,000 may still be brought in a federal district court if the monetary remedy sought is for reimbursement of promised federal aid rather than "money damages."

> So compensation for breach of contract is outside the scope of § 702, see *Great–West Life & Annuity Insurance Co. v. Knudson*, 534 U.S. 204, 212, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002), while a demand for full payment under a grant-in-aid program such as Medicaid is a request for specific performance rather than damages. See also *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) (§ 702 does not cover claims that seek a financial substitute for the legally required performance by the agency); *Veluchamy v. FDIC*, 706 F.3d 810, 814–17 (7th Cir. 2013) (same).

*Id.*

In *Columbus*, a hospital claimed that it was statutorily entitled to an additional $20 million in financial aid for disaster relief from the Federal Emergency Management Agency ("FEMA"), and citing the Tucker Act in response to the Seventh Circuit ordering briefing on subject matter jurisdiction, sought to have its claim transferred from the Seventh Circuit to the Court of Federal Claims. *Id.* at 895-96. The Seventh Circuit denied the hospital's motion to transfer. *Id.* at 897. Explaining that the Supreme Court in *Bowen* "distinguished between money as compensation for an injury, and money *as the entitlement* under a grant program," the Seventh Circuit noted that although the hospital sought money, it did so "not as compensation for FEMA's failure to perform some other obligation" but instead "as 'the very thing to which [it] was entitled' under the disaster-

relief program." *Id.* at 896 (emphasis in original); *see also Veluchamy*, 706 F.3d at 815 (*Bowen* demands an inquiry whether a plaintiff seeks money damages as a "substitute" for a loss suffered or as a "specific" remedy for something to which the plaintiff was entitled). The Seventh Circuit also explained in *Columbus* that "[t]o the extent practical considerations matter, they favor[ed] jurisdiction in the district court" because the district court was the only forum that could address all of the hospital's claims, including those brought under the Stafford Act, the APA and the Federal Tort Claims Act. 708 F.3d at 897; *id.* ("28 U.S.C. § 1500 requires a party to elect between proceeding in the district court and proceeding in the claims court. Once a proceeding is under way in the Court of Federal Claims, any other suit based on the same operative facts must be dismissed.") (citing *United States v. Tohono O'odham Nation*, 563 U.S. 307 (2011)).

Here, plaintiff insists that the "key benefit" he seeks is "restoration" of Contract 1710, since it offers "the potential for repeated re-enrollments," but at the same time he questions why the contract payments to which he would have been entitled to this point "should go unrealized, particularly in light of his own continued and faithful performance." (Pl.'s Reply Br. (dkt. #23) at 27-28.) Plaintiff's assertion that he primarily hopes to re-enroll his land in the CRP is credible, given both the ten-year length of CRP contracts and that land enrolled in the last year of a CRP contract is at least *eligible* for renewed enrollment under 7 C.F.R. § 1410.6(a)(3). *Cf. Veluchamy*, 706 F.3d at 816 (finding the appellants' APA claim jurisdictionally barred for seeking money damages because the relief they requested was "merely a means to the end of satisfying a claim for the recovery of money" (quoting *Blue Fox*, 525 U.S. at 262)).

Furthermore, although plaintiff pled a "breach of contract" claim in his complaint, he principally seems to be challenging the USDA's decision upholding the denial of re-enrollment through Contract 1710 based on its interpretation of the agency's authority to change enrollment criteria prospectively; in other words, plaintiff refers to defendant's "breach of contract" principally to assert that it is entitled to payments that defendant has failed to make because of its arbitrary and capricious determination on administrative review. Since defendant does not dispute that the money to which plaintiff would have been entitled under Contract 1710 would be a certain, periodic payment out of funds earmarked to promote good forestry practices -- making it more of a claim to an entitlement rather than a substitute for a loss -- the court determines that it has jurisdiction to consider the merits of plaintiff's challenge to the USDA's actions, even though affording him relief may include a monetary remedy.

This then leaves the issue of this court's jurisdiction over plaintiff's apparent common law arguments regarding the alleged formation of a binding contract, which would appear to fall within the exclusive jurisdiction of the Court of Federal Claims. *See Columbus*, 937 F.2d at 1279 (contract claims against the United States exceeding $10,000 within the exclusive jurisdiction of Claims Courts, citing 18 U.S.C. §§ 1346(a)(2), 1491(a)(1)).[7] Here, too, the Seventh Circuit supplies an answer binding on this court. In *Western Securities Co. v. Derwinski*, 937 F.2d 1276 (7th Cir. 1991), the

---

[7] Perhaps this court could exercise supplemental jurisdiction over plaintiff's possible common law claim, but will decline to do so since: it is rejecting plaintiff's APA claim upon which federal jurisdiction is based and retention of a remaining state claim under these circumstances is generally disfavored; the Court of Claims is more familiar with the viability of such claims, if any; and plaintiff has wholly failed to develop any argument for this court's exercise of subject matter jurisdiction despite having an opportunity to do so in his reply brief.

court considered a similar "contract claim against the United States for more than $10,000," involving a mortgage company suit against the then Secretary of Veterans Affairs in his official capacity. *Id*. at 1279. As the Seventh Circuit recognized, "[a]t first glance the answer" to the question "whether the federal district court has original jurisdiction . . . is a resounding 'no'" for the same reason as appears here: "the larger claims being within the jurisdiction not of district courts but of the Claims Court, in Washington.' *Id* (citing 28 U.S.C. §§ 1346(a)(2), 1491(a)(1) and related cases). However, the Seventh Circuit went on to explain that since "[s]uits to enforce contracts with federal agencies are governed by federal common law," they "arise under federal law for purposes of [28 U.S.C. §] 1331." *Id.* at 1280 (citations omitted).[8] While recognizing an objection "that this interpretation of Section 1331 disrupts the allocation of jurisdiction between the district courts and the Claims Court' -- indeed, arguably swallows it whole -- the court went on to limit this jurisdictional exception to situations as in *Western* where "sovereign immunity for contract claims against the government are waived by other statutes." *Id.* at 1280-81. In *Western,* the "other statute" was the Veterans' Administration loan-guarantee program, 38 U.S.C. §§ 1801 *et seq*." *Id*.

Ultimately then, the question for this court is whether jurisdiction falls under the run-of-the-mill waiver of "sovereign immunity for contract claims against the government," which is subject to the allocation of the Tucker Act, or to "another statute." *Id.* at 1281. Even more specifically, the question under *Western* may be

---

[8] The court went on to advise that the result does not change even though the federal common law typically looks to an analog rule of state law in resolving any contract dispute. *Western*, 937 F.2d at 1280.

whether or not the USDA's authority to administer a conservation program under the Farms Services Agency, like the Veterans' Administrative loan-guarantee program, "empowers the federal courts to create in common law fashion such interpretive action, suppletive, and interstitial principals as may be necessary to the sound administration of the program." *Id*. at 1280. Since the answer would appear to be "yes," given that (again as in *Western*), this court must look to federal common law principles "or by borrowing existing principles of state law," and it is the "body of law that [Middelstadt] invoked in suing to enforce [his alleged contract]." *Id.* Moreover, like the Veteran's Administation in *Western*, the USDA's Commodity Credit Corporation that is the signator to Contract 653, and the putative signator to Contract 1710, is authorized to "sue and be sued." 15 U.S.C. § 714b(c). "These two elements—claim arising out of federal law, and waiver of sovereign immunity—" entitled Mittelstadt to bring his contract claim in this court. *Western*, 937 F.2d at 1280.


II.     **Challenges to Agency Decision**

        **A. Notice**

        The court then turns to the merits of plaintiff's challenge to the USDA's final, administrative decision under the APA. As an initial matter, plaintiff argues that the NAD hearing officer abused his discretion in determining that the FSA's denial of Mittelstadt's 2006 petition for re-enrollment for Tract 9073 was proper. Specifically, in light of the parties' pre-hearing stipulation that the "sole issue on appeal was the erroneous eligibility determination that was made in 1997," plaintiff argues he was

denied notice that the hearing officer would address the FSA's decision denying re-enrollment of Tract 9073 under Contract 1710, and even more specifically, he "was deprived of the opportunity to argue the issue." (Pl.'s Opening Br. (dkt. #15) at 35.) Unlike the parties, the court is at a disadvantage as to the scope and import of that stipulation, since neither side provided the 30-second audio recording of the pre-hearing to the court. Without the tape, the court will defer to the hearing examiner's understanding that it did not prevent his taking up the related issue of re-enrollment under the 1997 agreement in 2007.[9]

Even if the stipulation provided some cause for remand, plaintiff cannot claim credibly that despite the parties' stipulation, which makes little practical sense on its face, the denial of re-enrollment under Contract 1710 was both discussed at the hearing *and* an expected subject of the NAD hearing examiner's decision. Indeed, based on the decision of the State Committee, plaintiff was well-aware that the *same* core issue underlying the termination of Contract 653 entered into in 1997 -- the FSA's interpretation of what was required to satisfy "mixed hardwood" under the conservation plan -- also determined whether Tract 9073 would be re-enrolled in the CRP under Contract 1710 in 2007. Moreover, plaintiff cannot contend that he lacked notice or the opportunity to address the hearing officer's determination regarding Contract 1710 in his

_____

[9] Plaintiff is welcome to move for reconsideration if he believes the recording clearly shows otherwise, but given its length that seems unlikely. Indeed, an equally valid interpretation of the parties' stipulation might be that plaintiff was dropping a challenge to the denial of re-enrollment in 2007, but the court would again defer to the hearing examiner as to that interpretation.

subsequent appeal to Deputy Director Johnson or in his request for reconsideration by Director Klurfeld.[10]

### B. Changed Interpretation

Next, plaintiff argues that the USDA violated the APA by upholding the County Committee's denial of re-enrollment of Tract 9073 under Contract 1710 based on the FSA's newly-developed standard for the mixed hardwood requirement in its conservation plan. At the outset, plaintiff repeatedly emphasizes that the FSA could not *retroactively* cancel a CRP contract under a changed standard for the mixed hardwood requirement (*see, e.g.,* Pl.'s Opening Br. (dkt. #15) at 37), but plaintiff already won that argument. As defendant points out, NAD Deputy Director Johnson agreed and reinstated Contract 653 through its agreed upon termination date in 2007. Johnson's and NAD Director Klurfeld's decisions merely held that the FSA could apply its 2006 interpretation in deciding *prospectively* whether to re-enroll CRP land for another 10 years, including Mittelstadt's land when it came up for re-enrollment in 2007.

Alternatively, plaintiff argues that the FSA could not expect him to predict that conservation plan standards he was meeting under his 1997 CRP contract would be

---

[10] From what the court can discern, plaintiff's due process argument may really be trying to get at something else. Citing 7 C.F.R. § 1410.6(a)(3), plaintiff repeatedly insists that Tract 9073's eligibility for the CRP program under Contract 1710 depended on whether it was already enrolled under Contract 653. (See, e.g., Pl.'s Opening Br. (dkt. #15) at 21 ("Eligibility of Tract 9073 for Contract 1710 turned solely on whether 9073 was 'already enrolled.'"); Pl.'s Reply Br. (dkt. #23) at 19.) As defendant points out, however, *eligibility* does not mean *enrollment*. (Def.'s Opp'n Br. (dkt. #20) at 12.) Even though Deputy Director Johnson's decision reinstated Contract 653, therefore, it does not follow that Tract 9073 became automatically re-enrolled in the CRP under Contract 1710 if the criteria had changed.

changed when he applied for re-enrollment ten year later, much less to change his long-term mix of trees long since planted and approved under the old plan. Rather, plaintiff insists, the county FSA office "had an affirmative obligation to tell [him] how to improve Tract 9073's EBI score because Tract 9073 was already enrolled. If a proposal to mix hardwood plantings in a new way would have improved the EBI score for Tract 9073, FSA was obligated to so-inform [him]." (*Id.* at 27 (internal citations to the FSA Handbook omitted).)

The provision of the Handbook that plaintiff cites for this proposition, however, guarantees no such particularized, advance notice:

> The National EBI process will be used to rank and prioritize offers for enrollment into CRP for general signup offers.
>
> Producers must be provided a fact sheet describing EBI. FSA shall review the fact sheet with producers to ensure that producers are aware of the scoring process used for EBI. Producers shall sign CRP-2 to certify that they were informed of EBI and opportunities to enhance their score.
>
> FSA will review EBI scoring parameters with the producers and encourage the planting of cover types and conservation measures, if appropriate, that will provide higher environmental benefits. FSA employees must notify producers that submitting offers with annual rental payments less than the maximum payment rate will result in higher EBI scores.

("Handbook" (dkt. #16-1) at ECF 679.)[11]    Regardless, even if he had received more advance notice plaintiff essentially concedes that he would *not* have been able to comply

---

[11] Deputy Director Johnson also noted in his decision that Mittelstadt at least had notice of the interpretation of mixed hardwood stand that the FSA was applying before October 2007, the month that Contract 1710 was to begin, but it is not clear that he received meaningful notice before the State Committee issued its written decision, dated August 13, 2007, denying his

with the changed mixed hardwood standard before he was required to offer Tract 9073 for re-enrollment given the maturity of his forest by 2006.  (Pl.'s Reply Br. (dkt. #23) at 15-17.)

Perhaps most importantly, plaintiff fails to establish that the interpretation of "mixed hardwood stand" that the FSA ultimately applied to his offer to re-enroll Tract 9073 in Contract 1710 is inconsistent with the Handbook, regulations or ordinary meaning.  To the contrary, the FSA's interpretation requiring multiple species of hardwood trees to be planted together, rather than different types of hardwood planted together with pine, see *supra* note 6, at least appears reasonable on its face.  Plaintiff similarly fails to challenge the USDA's factual determination that Tract 9073 did not satisfy the new standard.

As the Director's decision indicated explicitly, and the Deputy Director's decision recognized at least implicitly, the CRP regulations afford the CCC wide discretion in accepting or rejecting offers to enroll or re-enroll land in the program, and to do so on a competitive basis, consistent with the program's primary goal of promoting environmental health and budgetary constraints.  *See* 7 C.F.R. § 1410.31(a) ("Acceptance or rejection of any offer, however, shall be in the sole discretion of the CCC and offers may be rejected for any reason as determined needed to accomplish the goals of CRP.").[12] Absent citation to authority establishing a right to the particularized process plaintiff

---

eligibility for re-enrollment.

[12] Defendant argues that if Contract 1710 went into effect, the regulations and the Handbook would have *required* the FSA or CCC to terminate it under the changed interpretation, but since the USDA did not rely on those provisions, neither will the court on review.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 93-94 (1943).

suggests he ought to have received, plaintiff's argument essentially comes down to a claim that he was entitled to re-enrollment of Tract 9073 in the CRP in 2007 (and arguably in perpetuity) under the original standards on which he enrolled the land in 1987. The notion that the FSA cannot flexibly address standards to meet the needs of the CRP over time, however, neither squares with the extent of discretion afforded by the statutes and regulations, nor with the purpose of carrying out the objectives of that program.

To be clear, the court does not intend to endorse what appears to have been a haphazard re-enrollment process on the FSA's part, but plaintiff has fallen far short of establishing that the USDA acted arbitrarily or capriciously or abused its discretion in affirming the denial of a second, ten-year re-enrollment of Tract 9073 under Contract 1710 in 2007.

## III.    Contract Claim

This then leaves plaintiff's argument that a binding contract was formed under common law when FSA's County Director Reuter signed Contract 1710 on behalf of the CCC, even though his signature was later whited-out and a copy of the signed contract was never returned to Mittelstadt by the FSA. When Mittelstadt submitted his formal offer to re-enroll Tract 9073 by signing and returning the amended version of Contract 1710, defendant does not dispute that Mittelstadt exposed himself to the possibility of paying liquidated damages if he revoked his offer within the time period for CCC's acceptance. (Def.'s Opp'n Br. (dkt. #20) at 9 (citing 7 C.F.R. § 1410.32(c)).) Although plaintiff now argues that this potential obligation to pay liquidated damages was

consideration for a contract that became binding as a "public record" when Reuter signed it (Pl.'s Opening Br. (dkt. #15) at 20-21), the court agrees with defendant that this theory runs afoul of traditional contract principles requiring delivery or communication of acceptance to the offeror. (Def.'s Opp'n Br. (dkt. #20) at 7 (citing cases).)[13] Essentially, Mittelstadt's commitment to pay liquidated damages if he revoked his offer was nothing more than proof of earnest, which is no more binding on the offeree than it would be for any other earnest money payment or good faith deposit required for an offer. Typically, the payment or deposit is applied to the purchase price if the offer is accepted or returned if declined, just as Mittelstadt's exposure to liquidated damages ended when the USDA declined his offer. *Cf. Galatowitsch v. Wanat*, 2000 WI App 236, ¶ 14, 239 Wis. 2d 558, 566, 620 N.W.2d 618, 622 (explaining that purpose of earnest money is to protect seller and provide liquidated damages as a remedy "without further fuss or bother").

Finally, the Handbook provision requiring the CRP contract to be "signed and dated by all required signatories" is not to the contrary, but is simply and straightforwardly a step in the required, express process for the contract to become binding. (Handbook (dkt. #16-1) at ECF 179.) Nor does plaintiff offer any facts or law to support his contrary interpretation. As a result, plaintiff's attempt to end run the USDA's rejection of Contract 1710 by resort to federal common law fairs no better than

---

[13] Plaintiff likewise provides no legal support for his alternative argument that his offer of Tract 9073 for re-enrollment was a contractual offer that was accepted when the form CRP contract was sent to him to sign, and then became "complete" once he signed it. (Pl.'s Reply Br. (dkt. #23) at 22-23.) Indeed, this argument runs afoul of the *express* language in the contract plaintiff now seeks to enforce, and he offers no facts that would support a contrary interpretation.

his APA claims. Additionally, plaintiff does not assert that he made his contract arguments during his administrative appeals, nor that the USDA failed to appreciate them. Accordingly, plaintiff's challenge to the USDA's actions on these grounds would appear to fail as well.

But for the fact that the defendant did not cross-move for summary judgment, it would likely be entitled to entry of summary judgment on this claim as well.[14] Since it did not, however, plaintiff is entitled to "notice and a reasonable opportunity to respond" before this court enters summary judgment. Fed. R. Civ. P. 56(f). This decision serves as ample notice, and plaintiff may respond at the bench trial scheduled for next week with a written response, oral proffer or presentation of evidence.

## ORDER

IT IS ORDERED that:

1) Plaintiff Mark Mittelstadt's motion for summary judgment (dkt. #18) is DENIED.

2) The decision of defendant Tom Vilsack, then Secretary of the U.S. Department of Agriculture, is AFFIRMED.

3) Defendant's motion to strike (dkt. #21) is DENIED as moot.

---

[14] In defendant's opposition brief, the USDA did expressly argue that "the final decision of the Secretary should be affirmed" (Def.'s Opp'n Br. (dkt. #20) at 22), but since it is unclear whether a common law contract claim was (or could have been) before the Secretary, a cross-motion was required.

4) The bench trial will proceed as scheduled on June 19, 2017, at which time the court will take up plaintiff's remaining common law contract claim.

5) A Final Pretrial Conference will be held telephonically this Friday, June 16, 2017, at 10:00 a.m. Plaintiff's counsel shall initiate the call to the court at (608) 264-5087.

Entered this 14th day of June, 2017.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge